ELLIOTTS, INC. Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Elliotts, Inc. v. Commissioner
Docket No. 10576-78.
United States Tax Court
T.C. Memo 1980-282; 1980 Tax Ct. Memo LEXIS 302; 40 T.C.M. (CCH) 802; T.C.M. (RIA) 80282; July 30, 1980, Filed; Reversed and Remanded September 26, 1983 William H. Adams and Glen E. Clark, for the petitioner. Dan A. Lisonbee, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioner's income tax for its fiscal years ending February 28, 1975, and February 28, 1976, in the amounts of $58,159.91 and $62,507.38, respectively. Some of the issues raised by the pleadings have been disposed of by the parties, leaving for our decision whether petitioner is entitled to deduct any amount in excess of $65,000 in each of its fiscal years 1975 and 1976 for compensation paid to its sole stockholder, chief executive officer, Mr. Edward G. Elliott. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Elliotts, Inc. (petitioner), an Idaho corporation *303 formed in 1952, had its principal place of business in Burley, Idaho at the time of the filing of its petition in this case. Petitioner filed corporate Federal income tax returns for its fiscal years ending February 28, 1975, and February 28, 1976. Petitioner's principal business is selling equipment manufactured by John Deere Company and servicing the equipment it sells as well as other equipment. During the years here in issue petitioner had the following contracts with John Deere Company: (a) John Deere Agricultural Dealer Agreement. (b) John Deere Agricultural Security Agreement. (c) John Deere Consumer Products Agreement. (d) John Deere Agricultural D.R.V. Leasing Agreement. (e) John Deere Industrial Construction Equipment Agreement. (f) John Deere Industrial Utility Equipment Agreement. (g) John Deere Forestry Equipment Agreement. Petitioner had two business locations during the years here in issue, one in Burley, Idaho and one in Idaho Falls, Idaho. The business located in Burley, Idaho dealt in both agricultural and industrial equipment, while the business located in Idaho Falls dealt only in industrial equipment. Of the approximately 168 John *304 Deere agricultural dealers in Zone 11, which includes the states of California, Nevada, Arizona, Utah, Oregon, Washington and Idaho, only three, including petitioner, were dealers in both agricultural equipment and industrial equipment. On March 1, 1975, petitioner sold its business located in Idaho Falls, Idaho to the Elliott Industrial Company and thereafter maintained only the business location in Burley, Idaho. When petitioner was initially incorporated in 1952, Mr. Elliott was not the sole stockholder. However, in 1954 he bought the interest of the other stockholder in petitioner and has since that time been petitioner's sole stockholder. Mr. Elliott has been petitioner's chief executive officer since its incorporation. For the first year after its incorporation petitioner sold only agricultural equipment in the Burley, Idaho area and had annual gross sales of approximately $500,000. At that time petitioner employed approximately 8 people. In its fiscal year ending February 28, 1975, petitioner was employing approximately 40 people, selling several lines of equipment, both agricultural and industrial, throughout southeast Idaho and had gross annual sales of over $5 million. *305 Mr. Elliott was born and reared in Boise, Idaho. He graduated from the University of Idaho in 1938 with a degree in Political Science. Shortly after finishing college he was employed by the Water Resource Branch of the Geological Survey and thereafter was a junior officer in a Civilian Conservation Corps camp in Idaho. Later he became a company commander in the Civilian Conservation Corps and remained in this position until he entered the military service during World War II. Following his releases from active duty in World War II, Mr. Elliott worked for approximately 5 years for the Veterans' Administration in Twin Falls, Idaho. When he resigned from the Veterans' Administration he, together with another person, purchased the John Deere dealership in Burley, Idaho and incorporated the business which is now Elliotts, Inc. In addition to being the president and general manager of petitioner since 1952, Mr. Elliott has participated in a number of civic and other activities including being chairman of the Small Business Advisory Committee for the State of Idaho and president of the Burley Chamber of Commerce and the South Idaho Chamber of Commerce. Until 1959, petitioner dealt *306 solely in agricultural equipment, but in 1959 began to handle industrial equipment manufactured by John Deere Company. During the years here in issue, as well as the years prior thereto, Mr. Elliott had the total final managerial responsibility for the business of petitioner. During these years petitioner had the following employees, in addition to Mr. Elliott, at its location in Burley, Idaho: 1 Office Supervisor 2-3 Agricultural Salesmen 2-3 Office Employees 1 Parts Manager 2 Parts Employees 1 Industrial Salesman 10-12 Agricultural Mechanics 6-7 Industrial Mechanics Approximately 28 employees For its fiscal year ending February 28, 1975, petitioner had the following employees, in addition to Mr. Elliott, at its location in Idaho Falls, Idaho: 1 Division Manager 2 Salesmen 2 Office Employees 1 Parts Manager 1 Service Manager 7-9 Mechanics Approximately 15 employees For the years in issue and for several years prior thereto Mr. Elliott was paid a base salary of $2,000 a month and in addition received a bonus at the end of each fiscal year. The bonus was based on a predetermined formula which had been in use since the incorporation of petitioner *307 and represented 50 percent of net profits because deductions for income taxes and management bonuses. Mr. Elliott's employment contract was not in writing and the provision for the bonus was not in writing and had no time period or other limitations as to the amount of the bonus. The following schedule shows the amounts which Mr. Elliott has been paid by petitioner as president and general manager of petitioner for its fiscal years ending February 28, 1968, through February 28, 1978: Fiscal Year Ending
Total Compensation
February 28
Paid to Mr. Elliott
1968
$ 42,800
1969
19,600
1970
34,035
1971
84,450
1972
68,323
1973
66,401
1974
136,536
1975
181,074
1976
193,663
1977
153,696
1978
83,052
During each of the years here in issue and for many years prior thereto, Mr. Elliott worked for petitioner from approximately 8 a.m. to 6 p.m., 6 days a week. Generally he worked approximately 80 hours a week. Mr. Elliott, as chief executive officer of petitioner, not only performed the functions of general manager but also most of the functions of sales manager and credit manager, and he made all policy decisions with respect to the parts and service department. *308 For each of its fiscal years ending February 28, 1968 through 1978, petitioner's net profits have been as follows: Fiscal Year Ending
After Tax
February 28
Net Profits *
Profits
1968
$ 25,090
$19,715
1969
5,635
4,206
1970
27,042
19,190
1971
77,569
43,934
1972
59,873
36,713
1973
57,951
37,268
1974
112,536
63,674
1975
157,074
88,969
1976
169,663
98,297
1977
129,696
78,250
1978
59,052
42,860
The annual return realized by petitioner for each of its fiscal years ending February 28, 1968, through February 28, 1978, on its equity based on total pre-tax income and on after tax profits separately for its agricultural operations and industrial operations, with invested capital allocated between the two on the basis of sales, was as follows: Percent of
Percent of
Percent of
Fiscal Year
Annual Return
Annual Return
Annual Return
Ending
on After Tax
on Agricultural
on Industrial
February 28
Equity *
Profits
Pre-Tax Income
Pre-Tax Income
1968
$130,387
15
20.47
Not shown
1969
131,518
3
4.28
Not shown
1970
149,442
13
18.10
Not shown
1971
192,708
23
40.25
Not shown
1972
226,629
16
26.42
Not shown
1973
263,030
14
24.51
19.31
1974 **
326,441
20
34.47
34.47
1975
415,133
21
120.43
(49.88)
1976
513,429
19
35.61
24.23
1977
590,597
13
13.42
12.66
1978
633,496
7
(6.96)
39.50
*309 For its fiscal year 1975 petitioner's industrial equipment as contrasted with its agricultural equipment operations in Burley, Idaho and Idaho Falls, Idaho incurred losses. The following schedule shows the income, costs and expenses of the industrial equipment operation of petitioner at Burley and Idaho Falls: Burley
Idaho Falls
Total Sales
$1,049,235.98
$1,191,166.01
Cost of Sales
950,287.86
1,086,563.20
Gross Margin
98,948.12
104,602.81
Other Income
53,945.85
47,328.57
152,893.97
151,931.38
Operating Expenses
230,656.24
161,987.22
Net Loss
($ 77,762.27)
($ 10,055.84)
In its fiscal years 1975 and 1976, petitioner paid bonuses to employees other than Mr. Elliott totaling $20,000 and $25,000 respectively. All of the employees of petitioner participated to some extent in these bonuses, the amount being determined by a vote of the board of directors and not by a preset formula as was the case of the bonus to Mr. Elliott. The following schedule shows the salaries *310 paid to petitioner's key employes, other than Mr. Elliott, during its fiscal years 1975 and 1976: Position
Annual Salary
Industrial Salesman
$36,471
Office Supervisor
20,666
Shop Foreman (Agricultural)
24,702
Parts Manager
13,362
During its fiscal year 1975, petitioner paid a salary of $15,253 to the division manager at Idaho Falls. Since its incorporation in 1952, petitioner has never paid a dividend to its shareholder, Mr. Elliott. For its fiscal years ending February 28, 1968 through 1972, petitioner did not account separately for its industrial sales and agricultural sales and related expenses. For this period petitioner's sales, compensation paid to Mr. Elliott, the percentage of compensation paid to Mr. Elliott of total sales, compensation paid to all employees, other than service labor, and the percentage of compensation paid to all employees of total sales were as follows: Fiscal Year
Compensation
Percent
Ending
Paid to
of
February 28
Sales
Officer
Sales
1968
$1,779,989
$42,800
2.40
1969
1,603,661
19,600
1.22
1970
2,760,991
34,035
1.23
1971
2,797,767
84,450
3.02
1972
3,637,614
68,323
1.88
*311 Total
Fiscal Year
Compensation
Percent
Ending
Paid to All
of
February 28
Employees
Sales
1968
$ 97,317
5.47
1969
79.443
4.95
1970
114,261
4.14
1971
186,178
6.65
1972
194,914
5.36
Beginning with its fiscal year ending February 28, 1973, and for all years thereafter, petitioner accounted for industrial sales and agricultural sales separately. For its fiscal years ending February 28, 1973, through February 28, 1978, petitioner's sales of agricultural equipment, the compensation paid to Mr. Elliott allocated to agricultural sales based on the percentage of agricultural sales to total sales, the percentage of compensation so computed paid to Mr. Elliott to agricultural sales, the compensation paid to all employees, other than service labor, allocated to agricultural sales, and the percentage of such total compensation paid to all employees to agricultural sales, were as follows: Fiscal Year
Compensation
Percent
Ending
Paid to
of
February 28
Sales
Officer
Sales
1973
$2,127,471
$ 34,727
1.63
1974
3,486,313
107,099
3.07
1975
3,042,791
104,286
3.43
1976
3,467,758
150,001
4.33
1977
3,558,513
119,149
3.35
1978
3,052,209
58,518
1.92
*312 Total
Fiscal Year
Compensation
Percent
Ending
Paid to All
of
February 28
Employees
Sales
1973
$117,889
5.54
1974
244,377
7.01
1975
219,089
7.20
1976
280,269
8.08
1977
262,849
7.39
1978
185,661
6.08
For its fiscal years ending February 28, 1973, through February 28, 1978, petitioner's sales of industrial equipment, the compensation paid to Mr. Elliott allocated to industrial sales based on the percentage of industrial sales to total sales, the percentage of compensation so computed paid to Mr. Elliott to industrial sales, the compensation paid to all employees, other than service labor, allocated to industrial sales, and the percentage of total compensation paid to all employees to industrial sales were as follows: Fiscal Year
Compensation
Percent
Ending
Paid to
of
February 28
Sales
Officer
Sales
1973
$1,940,440
$31,674
1.63
1974
958,241
29,437
3.07
1975
2,240,401
76,786
3.43
1976
1,009,378
43,661
4.33
1977
1,031,789
34,547
3.35
1978
1,279,659
24,533
1.92
Total
Fiscal Year
Compensation
Percent
Ending
Paid to All
of
February 28
Employees
Sales
1973
$107,525
5.54
1974
67,169
7.01
1975
161,315
7.20
1976
81,579
8.08
1977
76,212
7.39
1978
77,839
6.08
*313 Since 1967, John Deere Company has published an annual Dealer Comparative Management Review. From 1967 through 1971, John Deere Company did not separate industrial and agricultural dealers in this review, but after 1971 a separate review was published for agricultural and industrial dealers. Included in these reviews were statistical summaries of the operations of the dealers covered by the report, including profitability, return on equity, compensation paid to all employees, compensation paid to officers, owners and managers, and sales. The agricultural dealers are separated by regions and then further separated based on the sales volume of the dealer. In this review industrial dealers are separated by region and also separated by sales volume. However, the dealers by region are not further separated based on the sales volume of the dealers. These statistics are compiled from reports submitted by the dealers to John Deere Company. Not all dealers are included in the survey, but over one-half of the dealers are included. All dealers are required to submit these reports. The statistics from the "operation analysis" are based on tax-adjusted information which is submitted during *314 the first 3 or 4 months of the following year. The statistics from the "employee analysis" are gathered in November and December and are based on a different sample than the "operation analysis" statistics. The information for the "employee analysis" is obtained by John Deere Company by surveys sent to all John Deere dealers. The response to these surveys is voluntary by the various dealers. Because the information is compiled in November and December, the salary information may or may not reflect bonuses paid to employees. The dealers included in the sample used for the "operation analysis" are dealers who have adopted the John Deere accounting system. Also, an attempt is made to exclude from the sample those dealers which handle both agricultural and industrial equipment. Because petitioner did not adopt the John Deere accounting system until its fiscal year ending February 28, 1975, it would not have been included in the "operation analysis" sample for the calendar years through 1975. Also, because petitioner handled both agricultural and industrial equipment it was probably excluded from the sample for subsequent years. The classification contained in the "operation analysis" *315 headed "Salary and Compensation Paid to Officers, Owners and Managers" generally includes the compensation to owners, corporate officers, general managers, sales managers, parts managers, service managers and possibly other management personnel. However, some reporting dealers do not include all of these employees within the classification. John Deere Company imposes no guidelines in this regard. Based on statistics compiled and published by John Deere Company in its "operation analysis," the following schedule shows the average total sales, average compensation paid to officers, owners and managers, the percentage of compensation paid to such officers of sales, the average total compensation paid to employees, other than service labor, and the percentage of such compensation to sales for John Deere agricultural dealers located in Zone 11 which had total sales of $800,000 or above for the calendar years 1967 through 1973: Average
Compensation
Paid to
Officers,
Percent
Calendar
Average
Owners and
of
Year
Sales
Managers
Sales
1967
$1,155,308
$20,889
1.81
1968
1,318,883
32,134
2.44
1969
1,106,663
27,090
2.45
1970
1,237,612
47,797
3.86
1971
1,499,603
48,524
3.24
1972
1,403,268
43,749
3.12
1973
2,273,230
75,127
3.30
*316 Average Total
Compensation
Percent
Calendar
Paid to All
of
Year
Employees
Sales
1967
$ 56,818
4.92
1968
79,902
6.06
1969
64,310
5.81
1970
100,245
8.10
1971
107,263
7.15 *
1972
96,613
6.88
1973
153,312
6.74
The following schedule shows the information compiled by John Deere Company in its "operation analysis" for the years 1974 through 1977 for agricultural dealers located in Zone 11 with sales comparable to petitioner's, for total compensation paid to officers with the percentage of such compensation to sales, and total compensation paid to all employees with the percentage of such compensation to sales: Average
Compensation
Paid to
Officers,
Percent
Calendar
Average
Owners and
of
Year
Sales
Managers
Sales
1974
$3,073,860
$117,899
3.84
1975
3,817,313
130,067
3.41
1976
4,660,968
138,988
2.98
1977
4,177,737
149,512
3.58
Average Total
Compensation
Percent
Calendar
Paid to All
of
Year
Employees
Sales
1974
$213,377
6.95 *
1975
241,352
6.32
1976
283,407
6.08
1977
281,780
6.74
*317 The above information was compiled from agricultural dealers with sales in excess of $1,367,000 for 1974, $1,871,000 for 1975, $2,358,600 for 1976, and $2,568,800 for 1977. The following schedule lists the indicated information compiled by John Deere Company in its "operation analysis" for the years 1972 through 1977 for all North American industrial dealers with sales in excess of or under the amounts shown: Average
Compensation
Paid to
Sales
Officers,
Calendar
In Excess Of
Average
Owners and
Year
Or Under
Sales
Managers
1972
In excess of
$1,500,000
$2,241,806
$ 74,830
1973
Under
1,317,000
944,773
34,343
1974
In excess of
2,196,000
3,594,992
136,717
1975
Under
1,107,000
755,929
37,490
1976
Under
1,377,700
967,430
39,330
1977
Under
1,652,000
1,214,040
42,581
Average Total
Percent
Compensation
Percent
Calendar
of
Paid to All
of
Year
Sales
Employees
Sales
1972
3.34
$156,606
6.99
1973
3.64
66,154
7.00
1974
3.80
276,496
7.69
1975
4.96
69,182
9.15
1976
4.07
81,551
8.43
1977
3.51
91,771
7.56
*318 The following schedule shows on the basis of the "employee analysis" published by John Deere Company the average salary paid to managerial personnel, the average number of such personnel reported per dealership, the number of dealers reporting in each category, and the average hours worked per week for John Deere agricultural dealers located in Zone 11 which had total sales of $1,367,000 or above for the calendar year 1974, total sales of $1,871,000 or above for 1975, total sales of $2,358,600 or above for 1976, and total sales of $2,568,800 or above for 1977: No. Per
Calendar
Dealership
Year
Position
Reporting
1974
Owners/General Manager
1
Sales Manager
1
Parts Manager
1
Service Manager
1
1975
Owners/General Manager
1.7
Sales Manager
1.2
Parts Manager
1.2
Service Manager
1.1
1976
Owners/General Manager
1.47
Sales Manager
1
Parts Manager
1.20
Service Manager
1.07
1977
Owners/General Manager
1.24
Sales Manager
1
Parts Manager
1.13
Service Manager
1.06
No. of
Dealers
Reporting
Average Hours
Calendar
in Each
Average
Worked
Year
Category
Salary
Per Week
1974
Not shown
$22,636
Not available
Not Shown
18,813
Not available
Not shown
12,814
Not available
Not shown
13,892
Not available
1975
48
25,505
46
17
21,578
45
44
14,117
44
48
14,791
44
1976
72
40,122
44
25
27,760
44
53
14,232
44
49
16,044
43
1977
38
41,476
44
22
32,557
45
38
17,301
44
35
18,012
43
*319 The following schedule shows on the basis of the "employee analysis" published by John Deere Company the average salary paid to managerial personnel, the average number of such personnel reported per dealership, the number of dealers reporting in each category, and the average hours worked per week for North American John Deere industrial dealers which had total sales of $1,317,000 or below for the calendar year 1973, total sales of $2,196,000 or above for the calendar year 1974, total sales of $1,107,000 or below for the calendar year 1975, total sales of $1,377,700 or below for the calendar year 1976, and total sales of $1,652,700 or below for the calendar year 1977: No. Per
Calendar
Dealership
Year
Position
Reporting
1973
Owners/General Manager
Not available
Sales Manager
Not available
Parts Manager
Not available
Service Manager
Not available
1974
Owners/General Manager
1
Sales Manager
None
reported
Parts Manager
1
Service Manager
1
1975
Owners/General Manager
1.3
Sales Manager
1.1
Parts Manager
1.0
Service Manager
1.3
1976
Owners/General Manager
1.3
Sales Manager
1
Parts Manager
1
Service Manager
1.2
1977
Owners/General Manager
1.2
Sales Manager
1.1
Parts Manager
1
Service Manager
1.2
*320 No. of
Dealers
Reporting
Average Hours
Calendar
in Each
Average
Worked
Year
Category
Salary
Per Week
1973
Not shown
$16,175
Not available
Not shown
16,526
Not available
Not shown
9,559
Not available
Not shown
10,440
Not available
1974
Not shown
23,384
Not available
Not shown
None
None
reported
reported
Not shown
13,371
Not available
Not shown
15,799
Not available
1975
63
19,099
46
9
15,112
43
29
11,433
45
43
11,908
45
1976
89
22,061
44
16
17,334
44
42
12,607
44
54
20,886
45
1977
78
24,940
49
17
20,088
51
35
16,980
45
57
25,441
44
The statistics compiled by John Deere Company as its "operation analysis" show the following average return on equity (based on pre-tax income) for John Deere agricultural dealers located in Zone 11 in the same sales volume classification as petitioner, and for John Deere industrial dealers in the same sales volume classification as petitioner: Percent of
Percent of
Calendar
Average Return
Average Return
Year
For Agricultural
For Industrial
1967
28.61
1968
18.79
1969
13.10
1970
13.32
1971
19.71
1972
19.36
41.31
1973
31.53
29.56
1974
50.51
24.66
1975
48.77
5.20
1976
38.90
13.60
1977
36.10
16.00
*321 The average net profits before taxes for John Deere dealers with sales comparable to petitioner's for the calendar years 1974 and 1975 and petitioner's total net profits before taxes (not segregated between agricultural and industrial operations) for its fiscal years 1975 and 1976 were as follows: John Deere Dealers
Calendar
Average Net Profits
Year
Agri.
Indus.
Total
1974
$198,159
$192,956
$391,115
1975
258,592
8,076
266,668
Fiscal
Year
Petitioner's
Calendar
Ending
Total
Year
Feb. 28
Net Profits
1974
1975
$157,074
1975
1976
169,663
Petitioner on its Federal income tax returns for its fiscal years ending February 28, 1975, and February 28, 1976, deducted $181,073.71 and $193,662.71, respectively, as compensation of officer, representing payments by petitioner to Mr. Elliott in each of these years. Respondent in his notice of deficiency disallowed $116,073.71 and $128,662.91 of the claimed deductions for compensation of officer for petitioner's fiscal years ending February 28, 1975, and February 28, 1976, respectively, with the following explanation: It is determined that compensation paid to Edward *322 G. Elliott during the taxable years ended 2/28/75 and 2/28/76 is excessive in the amounts of $116,073.71 and $128,662.91, respectively. Such amounts exceed a reasonable allowance for salaries and other compensation for personal services rendered within the ambit of section 162 of the Internal Revenue Code. Compensation has been allowed in the amount of $65,000.00 for each year. OPINION Section 162, I.R.C. 1954, [1] provides for the allowance of deductions for all ordinary and necessary expenses paid during the taxable year in carrying on a trade or business, including "a reasonable allowance for salaries or other compensations for personal services actually rendered." The issue here is whether the amounts paid by petitioner to Mr. Elliott in petitioner's fiscal years 1975 and 1976 were reasonable compensation for personal services actually rendered and, if not, to what extent these payments exceeded such reasonable compensation. *323 It is petitioner's position that the entire amounts paid to Mr. Elliott represent reasonable compensation for personal services actually rendered by Mr. Elliott to petitioner. Petitioner contends that because it had a predetermined formula which had been in use since its incorporation for the bonus paid to Mr. Elliott, the amounts paid in the years here in issue, though high, were reasonable. Petitioner argues that its formula of paying Mr. Elliott 50 percent of the net profits of petitioner before deductions for income taxes and management bonuses was a reasonable formula for determining Mr. Elliott's compensation and did not represent a disguised distribution of profits. Petitioner further argues that in some prior years Mr. Elliott's salary had been too low for the services he rendered to petitioner and for this reason the higher salaries in the years here in issue resulted in average reasonable compensation during the 10-year period covering petitioner's fiscal years 1968 through 1978. Petitioner contends that the stipulated evidence of the amounts paid by other John Deere dealers to officers when compared to the average sales of such businesses supports its position that *324 Mr. Elliott's salary was reasonable. Respondent takes the position that, since Mr. Elliott was the sole shareholder of petitioner, any agreement between Mr. Elliott and petitioner concerning Mr. Elliott's receiving a percentage of petitioner's profits as a bonus was not an arm's-length agreement and therefore should be given no weight in determining the reasonableness of the amounts paid to Mr. Elliott. Respondent further argues that the arrangement between petitioner and Mr. Elliott, considered in light of the fact that petitioner had not paid a dividend to Mr. Elliott, its sole shareholder, during its entire history is strong evidence that a part of the profits of petitioner paid to Mr. Elliott in the guise of compensation was in reality a dividend to Mr. Elliott. Relying on Charles McCandless Tile Service v. United States,191 Ct. Cl. 108, 422 F.2d 1336 (1970), respondent contends that at least 15 percent of the earnings and profits of petitioner before income taxes and payments to Mr. Elliott were dividends and not compensation for services rendered by Mr. Elliott. Respondent further contends that, properly interpreted, the statistical information stipulated *325 into the record with respect to the earnings, profits and salaries paid by other John Deere dealers supports his position that any amount in excess of $65,000 each year paid by petitioner to Mr. Elliott is excessive and not reasonable compensation for services rendered by Mr. Elliott. Respondent points out that the record shows that the services rendered by Mr. Elliott to petitioner did not change in the years here in issue from the services he rendered in prior years, although the amounts paid to Mr. Elliott during the years here in issue were greatly in excess of the amounts paid to him in prior years. It is well settled that whether compensation paid by a taxpayer to an officer or employee is deductible as reasonable compensation for the services rendered is a question of fact to be determined from all the evidence in the case. Charles Schneider & Co. v. Commissioner,500 F.2d 148 (8th Cir. 1974), affirming a Memorandum Opinion of this Court. It is equally well settled that respondent's determination carries a presumption of correctness and the burden is on petitioner *326 to show that it is entitled to deductions for compensation paid to officers in excess of the amounts allowed by respondent. Laure v. Commissioner,70 T.C. 1087, 1097 (1978). Some of the factors to be considered in making the determination of whether amounts paid to an officerstockholder represent reasonable compensation for services rendered are set forth in section 1.162-7(b), Income Tax Regs.[2] Further guidelines have been listed in a number of cases. A summary of some of the factors to be considered are set forth in Charles Schneider & Co. v. Commissioner,supra at 152, as follows: *327 Such factors include the employee's qualifications; the nature, extent and scope of the employee's work; the size and complexities of the business; a comparison of salaries paid with the gross income and the net income; the prevailing general economic conditions; comparison of salaries with distributions to stockholders; the prevailing rates of compensation for comparable positions in comparable concerns; the salary policy of the taxpayer as to all employees; and in the case of small corporations with a limited number of officers the amount of compensation paid to the particular employee in previous years. Mayson Mfg. Co. v. Commissioner, 178 F.2d 115, 119 (6th Cir. 1949). It is also clear that in determining the reasonableness of the amount paid, the criteria is whether the amount paid to the individual whose compensation is questioned is reasonable and not the overall reasonableness of the total wages paid by the taxpayer. Commissioner v. R. J. Reynolds Tobacco Company,260 F.2d 9, 13 (4th Cir. 1958), *328 affirming a Memorandum Opinion of this Court. Where, as here, there is only one stockholder of a corporation which had no history of dividend payment, the courts have closely scrutinized the arrangements made for his compensation to ascertain whether a part of the amount claimed to be deductible is in reality a distribution of corporate profits. Charles Schneider & Co. v. Commissioner,supra;Pacific Grains, Inc. v. Commissioner,399 F.2d 603 (9th Cir. 1968), affirming a Memorandum Opinion of this Court; Logan Lumber Co. v. Commissioner,365 F.2d 846 (5th Cir. 1966), affirming on this issue a Memorandum Opinion of this Court. The fact that a longstanding formula is used in determining compensation of a sole shareholder is of little weight. No special incentive is necessary to insure his best efforts since he would "receive the fruits of success through his status as the majority shareholder." Charles Schneider & Co. v. Commissioner, supra at 153. Petitioner in its argument relies primarily on the testimony of an expert witness who gave as his opinion that the amount paid by petitioner to Mr. Elliott *329 in each of the years here in issue was reasonable compensation for the services rendered by Mr. Elliott. This witness stated that the bases of his opinion were (1) the amount of officer's compensation as a percentage of sales paid by other John Deere dealers based on the "operation analysis" published by John Deere Company, (2) the fact that the absolute amount of salary paid by petitioner to Mr. Elliott was less than half the average salary paid to the chief executive officer by 500 leading publicly-held companies in the United States as listed in Forbes Magazine, (3) the relatively low salary paid to Mr. Elliott in some prior years, (4) the fact that Mr. Elliott's bonus had been consistently determined for a number of years, and (5) the absolute amount of Mr. Elliott's salary adjusted for inflation. [3] This witness further relied on the return on equity of petitioner after deduction of Mr. Elliott's salary. The witness considered it immaterial that the total compensation paid to officers, managers, and owners by other John Deere dealers may have been an amount paid to more than one individual. He also considered the profitability of the business not to be relevant in determining *330 the amount of reasonable compensation [4] since that figure would not take into consideration the level of capitalization of the company. However, this witness did not know the amount of borrowed capital which might have been used by either petitioner or other John Deere dealers. The witness did not consider it necessary to adjust the amounts paid to officers by other John Deere dealers for the fact that in many instances the payments were made to more than one individual. This expert did not know the duties of Mr. Elliott as compared to the duties of the officers of other John Deere dealers. The expert gave no basis for his assumption that Mr. Elliott may have been underpaid in prior years. In any event, nothing in this record shows that any portions of the payments made to Mr. Elliott in the years here in issue were intended to be or were for services in prior years. The witness did not explain why he considered, after an adjustment for inflation, reasonable compensation for Mr. Elliott in the years here in issue should be more than in any prior or subsequent year. In our view petitioner's expert did not consider all pertinent factors and considered some irrelevant factors in *331 arriving at his conclusions. For this reason we give little weight to his opinion. *332 Considering the evidence here as a whole, we conclude that in fact the system used by petitioner to determine Mr. Elliott's salary was partially, and was intended to be partially, a distribution of profits to Mr. Elliott. As pointed out in Laure v. Commissioner, supra at 1097-1098, an amount which is in fact a distribution of profit and not intended as compensation for personal services actually rendered is not deductible as compensation even though otherwise compensation might be considered reasonable. In the instant case we have no basis for determining the amount of the payment to Mr. Elliott which was in fact, and was intended to be a distribution of profits as distinguished from compensation.However, on the basis of this record we do not consider the entire amounts paid to Mr. Elliott to be reasonable compensation for the services he rendered to petitioner. Under these circumstances, the best method of determining the amounts paid to Mr. Elliott which were distributions of profits is to determine, on the basis of the other evidence in the record, the amount of *333 reasonable compensation for Mr. Elliott in each of the years here in issue. See Commissioner v. R.J. Reynolds Tobacco Company, 260 F.2d 9 (4th Cir. 1958), affirming a Memorandum Opinion of this Court. As was there pointed out (at 12): If there is a reasonable basis in the record for isolating that part of the payment which is reasonable compensation for services, we think that a deduction for that part should be allowed. This is true whether the excess is classified as unreasonable compensation or as dividends.* * * We have reviewed all the facts in this record with special consideration to the statistics stipulated with respect to salaries paid by other John Deere dealers which had sales comparable to petitioner's. We have used the calendar years 1974 and 1975 as being roughly comparable to petitioner's fiscal years ending February 28, 1975, and February 28, 1976. We have also taken into consideration the number of persons to whom the salaries were paid and the profitability of the operations. We do not consider the amount of salaries paid by 500 unidentified leading publicly-held corporations partially relied on by petitioner's expert witness to be in *334 any way indicative of reasonable compensation for Mr. Elliott. The record shows that petitioner's profit from agricultural sales for its fiscal year ending February 28, 1975, was phenomenally high as cmpared to other John Deere dealers. However, for its fiscal year 1975 petitioner had a substantial loss on its industrial sales whereas other John Deere dealers had a substantial profit on such sales. Also, we have noted that, compared with other years, all John Deere agricultural dealers in the area in which petitioner operated with sales volume comparable to petitioner's had higher profits than in any other year for which we have statistics, indicating that economic conditions substantially contributed to the profitability of sales of agricultural equipment in that year. We have also noted that the average return of John Deere agricultural dealers in 1975 on sales was substantially higher than petitioner's return on agricultural sales, although in this year petitioner's return on industrial sales was higher than the average return of John Deere dealers on industrial sales. In our view, the breakdown of statistics between industrial and agricultural sales for a comparison of *335 the reasonableness of the salary petitioner paid to Mr. Elliott has less meaning than it would have if the salary paid to Mr. Elliott had not been allocated on the basis of sales in making the comparison. We are aware that no separate bookkeeping system was maintained to show what portion of Mr. Elliott's compensation was for his work for the part of the business dealing in agricultural equipment and what part was for his work for the part dealing in industrial equipment. However, Mr. Elliott's compensation as computed by petitioner was based on profits and not on sales. Therefore, any comparisons based on sales broken down between the two operations has less meaning than it might have under other circumstances. While Mr. Elliott's management of petitioner in a manner to return a profit indicates that he was a capable executive, there is nothing in this record to show that he had any special expertise. Compare Laurie v. Commissioner, supra. In fact, this record shows that for the two years here in issue petitioner's operation was overall less profitable than the operations of other John Deere dealers. However, we do consider the salaries paid by other John Deere dealers *336 to their officers and managers with reference to the volume of sales and profitability of the operation and the number of officers of the business to whom the amounts were paid to be indicative of a reasonable salary for Mr. Elliott. We have examined both the "operation analysis" and the "employee analysis," bearing in mind that the "employee analysis" may well reflect salaries of officers before bonuses. Based on the record as a whole, and considering (1) the nature of the work done by Mr. Elliott, (2) the hours he worked, (3) the lack of difference in his work in the years here in issue and prior years, (4) the fact that in many instances salaries paid by other John Deere dealers were paid to more than one individual, and (5) the level of salaries paid by petitioner to executive employees other than Mr. Elliott, we conclude that reasonable compensation for Mr. Elliott for petitioner's fiscal years ending February 28, 1975, and February 28, 1976, was $120,000 and $125,000, respectively. We therefore sustain respondent's disallowance of petitioner's claimed deduction for compensation paid to Mr. Elliott which is in excess of these amounts. Decision will be entered under Rule *337 155. Footnotes
*. After salary to Mr. Elliott and before State and Federal income taxes.↩
*. Invested capital plus retained earnings. ** Information to allocate is not available and therefore this year is based on total return on total equity for each category.↩
*. This figure is taken from the stipulation although mathematically this figure would come out to 7.18.↩
*. This figure is taken from the stipulation although mathematically this figure would come out to 6.94.↩
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise stated.↩
2. Section 1.162-7(b)(1), (2) and (3), Income Tax Regs., provide as follows: SEC. 1.162-7 Compensation for personal services.
* * *
(b) The test set forth in paragraph (a) of this section and its practical application may be further stated and illustrated as follows: (1) Any amount paid in the form of compensation, but not in fact as the purchase price of services, is not deductible. An ostensible salary paid by a corporation may be a distribution of a dividend on stock. This is likely to occur in the case of a corporation having few shareholders, practically all of whom draw salaries. If in such a case the salaries are in excess of those ordinarily paid for similar services and the excessive payments correspond or bear a close relationship to the stockholdings of the officers or employees, it would seem likely that the salaries are not paid wholly for services rendered, but that the excessive payments are a distribution of earnings upon the stock. An ostensible salary may be in part payment for property. This may occur, for example, where a partnership sells out to a corporation, the former partners agreeing to continue in the service of the corporation. In such a case it may be found that the salaries of the former partners are not merely for services, but in part constitute payment for the transfer of their business. (2) The form or method of fixing compensation is not decisive as to deductibility. While any form of contingent compensation invites scrutiny as a possible distribution of earnings of the enterprise, it does not follow that payments on a contingent basis are to be treated fundamentally on any basis different from that applying to compensation at a flat rate. Generally speaking, if contingent compensation is paid pursuant to a free bargain between the employer and the individual made before the services are rendered, not influenced by any consideration on the part of the employer other than that of securing on fair and advantageous terms the services of the individual, it should be allowed as a deduction even though in the actual working out of the contract it may prove to be greater than the amount which would ordinarily be paid. (3) In any event the allowance for the compensation paid may not exceed what is reasonable under all the circumstances. It is, in general, just to assume that reasonable and true compensation is only such amount as would ordinarily be paid for like services by like enterprises under like circumstances. The circumstances to be taken into consideration are those existing at the date when the contract for services was made, not those existing at the date when the contract is questioned.↩
3. As his analysis of the absolute amounts of compensation paid to Mr. Elliott based on adjustments for inflation, the witness relied on the following stipulated fact: Fiscal
Compensation
Federal
Year
Paid to
Income
Ending
Edward Elliott
Taxes *
Net
1968
$ 42,800
$ 9,844
$ 32,956
1969
19,600
3,136
16,464
1970
34,035
5,446
28,589
1971
84,450
23,646
60,804
1972
68,323
19,130
49,193
1973
66,401
22,576
43,825
1974
136,536
54,614
81,922
1975
181,074
86,915
9,158 **
1976
193,663
83,275
110,388
1977
153,696
66,089
87,607
1978
83,052
32,390
50,662
Net
Fiscal
Consumer
Compensation
Year
Price Index
Adjusted for
Ending
(1967=100.0)
Inflation
1968
104.2
$31,628
1969
109.8$14,995
1970
116.3
24,582
1971
121.3
50,127
1972$125.3
39,260
1973
133.1
32,926
1974
147.7
55,465
1975
161.2
58,411
1976
170.5
64,744
1977
185.0
47,355
1978
200.0
25,331
* Based on an average rate for all income for Edward Elliott after taking into account deductions from adjusted gross income. ** This figure is taken from the stipulation although mathematically this figure would come out to 94,159. ↩
4. This witness testified as follows: Q * * * In arriving at your conclusion in this case, did you take into consideration the fact that in some occasions, the profits of Elliotts, Inc. are lower than the profits of other dealers, average? A The absolute profits? Q Yes. A Yes, I did.Again, my opinion. But in my opinion, the level of absolute profits is a relatively meaningless number. And the reason I say that is because comparing Elliotts' profits to another dealer's profits is like comparing General Motors' profits to John Deere's profits. One has much more capital. One obviously ought to have more profits. And absolute profit, that does not take -- and absolute profit number that doesn't take into consideration the level of capitalization doesn't mean a whole lot. And to make it meaningful, you've got to normalize it using something like earnings per share or return on equity. Those numbers are much more meaningful.↩