ELLIOTTS, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Elliotts, Inc. v. Commissioner
Docket No. 10576-78.
United States Tax Court
T.C. Memo 1984-516; 1984 Tax Ct. Memo LEXIS 157; 48 T.C.M. (CCH) 1245; T.C.M. (RIA) 84516; September 27, 1984. William H. Adams,Glen E. Clark and William K. Smith, for the petitioner. Dan A. Lisonbee and Julie E. Tamuleviz, for the respondent. SCOTT MEMORANDUM OPINION SCOTT, Judge: Respondent determined deficiencies in petitioner's income tax for its fiscal years ending February 28, 1975, and February 28, 1976, in the amounts of $58,159.91 and $62,507.38, respectively. The issue for decision is the amount which petitioner is entitled to deduct in each of its fiscal years 1975 and 1976 as reasonable compensation to its sole stockholder, chief executive officer, Mr. Edward G. Elliott. On July 30, 1980, the Memorandum findings of Fact and *158 Opinion of this Court was filed (T.C.Memo. 1980-282), and on December 16, 1980, the decision of this Court was entered determining deficiencies in income tax due from petitioner for its fiscal years ending February 28, 1975, and February 28, 1976. In Elliotts, Inc. v. Commissioner,716 F.2d 1241 (9th Cir. 1983), the Court of Appeals reversed and remanded this case to this Court for reconsideration in light of its opinion. The Circuit Court stated that on remand this Court should begin its analysis by looking at the reasonableness of the compensation payments and should consider the reasonableness of the amounts of the bonus payments to Mr. Elliott in the context of the reasonableness of the formula used to determine them.The Circuit Court specifically stated that this Court should not assume solely from Mr. Elliott's role as sole shareholder and from the absence of dividends that thecompensation payments necessarily contained disguised dividends. In its opinion, the Circuit Court stated that-- If a corporation has multiple shareholders, the existence of a plan *159 which compensates shareholder-employees in proportion to their ownership interests may be evidence that compensation payments contain disguised dividends. In the case of a sole shareholder, such evidence is meaningless. [716 F.2d at 1243.] On remand, we were directed to consider five specific factors, with no single factor being decisive of the question.The five factors we were directed to consider are: (A) The role in the company of the employee whose salary is under consideration. (B) An external comparison of the employee's salary with those paid by similar companies for similar services. (C) The character and condition of the company. (D) Any conflict of interest which should focus on the relationship existing between the taxpaying company as its employee "which might permit the company to disguise nondeductible corporate distributions of income as salary expenditures deductible under section 162(a)(1)." [1]716 F.2d at 1246. In this respect the Circuit Court stated that-- In this case, where Elliott was the sole shareholder, the *160 sort of relationship existed that warrants scrutiny. The mere existence of such a relationship, however, when coupled with an absence of dividend payments, does not necessarily lead to the colclusion that the amount of compensation is unreasonably high. * * * [716 F.2d at 1246.] The court stated (as 1247) that further exploration of the situation is necessary, and it is appropriate "to evaluate the compensation payments from the perspective of a hypothetical independent shareholder." The court further stated that if the bulk of the corporation's earnings are being paid out in the form of compensation, so that the profits after payment of the compensation do not represent a reasonable return on the shareholder's equity, an independent shareholder would probably not approve of the compensation arrangement. However, if this is not the case and the company's earnings on equity remain at a level that would satisfy an independent investor, there is a strong indication that management is providing compensable services and the profits are not being siphoned out of the company disguised *161 as salary. (E) Internal consistency. In this respect, the Circuit Court stated that evidence of an internal inconsistency in the company's treatment of payments to employees may indicate that the payments go beyond reasonable compensation. The court in this respect stated: Bonuses that have not been awarded under a structured, formal, consistently applied program generally are suspect * * * as are bonuses consistently designated in amounts tracking either the percentage of the recipient's stock holdings * * * or some type of tax benefit * * *. Similarly, sarlaries paid to controlling shareholders are open to question if, when compared to salaries paid non-owner management, they indicate that the level of compensation is a function of ownership, not corporate management responsibility. * * * On the other hand, evidence of a reasonable, longstanding, consistently applied compensation plan is evidence that the compensation paid in the years in question was reasonable. [716 F.2d at 1247.] The court then stated (at 1248): The Tax Court failed to consider *162 the reasonableness of the contingent formula itself; it concentrated instead on the amounts paid under the formula in two particular years. Such a formula may overcompensate in good years and undercompensate in bad years. This feature, however, does not necessarily make the formula unreasonable. It is permissible to pay and deduct compensation for services performed in prior years. * * * The court stated that the reasonableness of a longstanding formula should not be determined on the basis of just 1 or 2 years and further stated (at 1248): Taxpayer persuasively argues that, accepting the Tax Court's determination of reasonable compensation for 1974 and 1975, Elliott was severely undercompensated in terms of constant dollars in six of the seven preceding years. [Footnote omitted.] [2]
*163 We were not directed to hold a further hearing or find any further facts. We therefore find the facts to be as set forth in our Memorandum findings of Fact and Opinion filed July 30, 1980. Petitioner, pursuant to an Order of this Court permitting the filing of briefs with respect to the reconsideration of this case on remand, filed such a brief, and respondent filed a reply thereto. In its brief on remand, petitioner concentrated on a schedule showing the average compensation paid to Mr. Elliott over the years 1968 through 1978, based on 1975 dollars, as $98,870, [3] *164 and the return on equity recived by petitioner after the payment of compensation to Mr. Elliott. [4]
Respondent in his reply brief answered petitioner's first argument by pointing out that the evidence in the record does not indicate that the compensation paid to Mr. Elliott in prior years was *165 less than reasonable or that $98,870 was reasonable compensation for any such prior year. Respondent states that the amount of return on equity that would be satisfactory to an independent shareholder should be considered not only absolutely but in light of the return of comparable companies, and that the record in this case shows that the return on equity of Elliotts, Inc., for its fiscal years 1975 and 1976 was substantially less than that of other comparable John Deere dealers for these same periods. Respondent further states that over the period for which information is in the record petitioner's return on equity was less than that of other John Deere dealers. We have reconsidered our opinion in light of the criteria we were directed to use by the Circuit Court of Appeals and, based on that consideration, conclude that $120,000 compensation for Mr. Elliott for petitioner's fiscal year ending February 28, 1975, and $125,000 for its fiscal year ending February 28, 1976, which we held to be reasonable compensation for Mr. Elliott in our opinion filed July 30, 1980, is reasonable compensation for the services rendered by Mr. Elliott to petitioner. In considering Factor *166 (A), "Role in the Company," which we were directed to consider by the Circuit Court, we again conclude that Mr. Elliott was a capable executive but had no special expertise. He worked long hours, 6 days a week from 8:00 a.m. to 6:00 p.m. and sometimes longer, generally working approximately 80 hours a week, performing the functions of general manager, sales manager and credit manager. In our view Mr. Elliott evidenced a high degree of personal dedication and devotion to his work. We conclude that these factors would entitle Mr. Elliott to a higher amount of compensation than would be paid to a less capable, devoted person who worked less hours per week. It was on the basis of the hours Mr. Elliott worked and the several functions he performed that we concluded, and again conclude, that Mr. Elliott was entitled to a salary in excess of the average salary paid to other John Deere chief officers and managers who worked less hours and split the functions performed by Mr. Elliott with other officers or employees. In our view an independent shareholder would have viewed as reasonable a salary for Mr. Elliott in excess of the average salary paid to executives of comparable John *167 Deere companies if such shareholder was aware of the fact that executives of the comparable companies did not work the hours Mr. Elliott worked. The record is devoid of evidence as to the capability, dedication and devotion to the interests of the employer of the less highly compensated executives of other John Deere dealers. Our findings of fact contain information from which Factor (B), "External Comparison," as set forth by the Circuit Court may be considered. As shown in our findings of fact, in 1974 the average salary paid by John Deere agricultural dealers located in the zone in which petitioner was located with total sales of $1,367,000 or above was $22,636, and for John Deere industrial dealers with total sales of $2,196,000 or above was $23,384. In 1975, John Deere agricultural dealers with total sales of $1,871,000 or above paid an average salary of $25,505 to each of their owners/general managers, and industrial dealers with sales of $1,107,000 or below paid an average salary of $19,099 to their owners/general managers. In 1975 the average number of owners/general managers of agricultural dealers was 1.7 and of industrial dealers, 1.3. The record shows that *168 both the agricultural dealers and industrial dealers for which the statistics were completed had sales managers (except for industrial dealers in 1974), parts managers and service managers. The record shows that at Idaho Falls, petitioner, in addition to Mr. Elliott, had a division manager, a parts manager and a service manager; and at Burley had an office supervisor and a parts manager, as well as salesmen and agricultural and industrial mechanics. We do not give great weight to the average compensation paid to owners/general managers set forth above since the record is not clear as to whether these figures include salaries and bonuses in all instances. However, the record contains information compiled by John Deere Company in its "operation analysis" for agriculltural dealers located in the zone with petitioner with sales comparable to petitioner's. This information shows that the average total compensation paid by these dealers to officers and owners/managers was $117,899 in 1974 and $130,067 in 1975. The "operation analysis" for all North American industrial dealers with sales over $2,196,000 in 1974 shows total average salaries paid to officers and owners/managers *169 was $136,717, and for such dealers with sales under $107 million in 1975 such total average compensation was $37,490. The record does not show the number of employees paid these total amounts, but from the employee analysis shown in the record the clear indication is that the total was paid to more than one person and for a combined average work week in excess of 80 hours. None of the dealers included in the statistics compiled by John Deere had sales of both agricultural and industrial equipment. An analysis of the compensation paid to the owners/general managers of other John Deere dealers, without adjustment for other factors, would indicate a reasonable salary for Mr. Elliott of somewhat less than the $120,000 for petitioner's fiscal year 1975 and $125,000 for its fiscal year 1976, which we have determined. However, in determining a reasonable salary for Mr. Elliott we considered other factors, particularly the fact that a dealer in both agricultural and industrial equipment might have more difficult management problems than a dealer with comparable sales in only one type of equipment. Factor (C), which we were directed by the Circuit Court to consider, is the character and *170 condition of the company. The Circuit Court stated that under this category focus should beon the company's size as indicated by its sales, net income and capital value, as well as the complexities of the business and general economic conditions. The court stated that to the extent they are relevant in this case we had adequately considered these factors. However, here again we stress the fact that in making comparisons of salaries paid and income earned we have compared petitioner to other John Deere Dealers of comparable size and in the general location in which petitioner operated. We have also given weight to the general economic conditions in the agricultural equipment industry in the years here involved which show that in these years economic conditions were responsible to an appreciable extent for the high sales volume of agricultural equipment by all John Deere dealers. Under Factor (D), we were directed to focus on facts that might indicate a conflict of interest, primarily the issue of whether some relationship exists between the taxpaying company and its employees which might permit the company to disguise nondeductible corporate distributions of income as *171 salary expenditures. As the Circuit Court points out, clearly, since Mr. Elliott was the sole shareholder, a relationship existed which warrants scrutiny. However, as again pointed out by the Circuit Court, the existence of this relationship, coupled with an absence of dividend payments, does not necessarily lead to the conclusion that the amount of compensation is unrealistically high. We were directed by the Circuit Court to evaluate the compensation payments to Mr. Elliott from the perspective of a hypothetical independent shareholder, looking particularly to whether the company's earnings on equity remained at a level that would satisfy an independent investor, which the Circuit Court concluded is a strong indication that management is providing compensable services and that profits are not being siphoned out of the company disguised as salary.The Circuit Court pointed to the average return of petitioner in the two fiscal years here involved, which was 19 percent after taxes, stating that we failed to consider the significance of this data and that "It seems clear, however, that this rate of return on equity would satisfy an independent investor and would indicate *172 that Taxpayer and Elliott were not exploiting their relationship." 716 F.2d at 1247. If the quoted statement was intended by the Circuit Court to be a conclusion that the compensation paid to Mr. Elliott in petitioner's fiscal years 1975 and 1976 was reasonable, there would have been no reason to remand the case to this Court for reconsideration. We recognize that the rate of return which would be satisfactory to an independent investor is a conclusory fact to be drawn from all the basic facts in the record. Here, petitioner has not attacked out basic finding of facts and apparently these basic findings were accepted by the Circuit Court. A conclusory fact as nebulous as the rate of return which would satisfy an independent investor is a question of judgment and, since this case was remanded to us, we conclude that the Circuit Court has directed us to express our opinion with respect to whether an independent investor would be satisfied with petitioner's rate of return, stating our reasons therefor. We have again considered the evidence with respect to the rate of return achieved by petitioner as compared to the rate of return achieved by other John Deere *173 dealers as shown by the statistics compiled by John Deere as its "operation analysis." The statistics of other John Deere dealers show that in 1974 the percent of average return to equity before taxes for agricultural dealers which operated in the same zone as petitioner and had the same sales volume was 50.51 percent, and the percent of average return for industrial dealers for this year was 24.66 percent. For its fiscal year ending February 28, 1975, which we must use as roughly comparable to the calendar year 1974 to compare statistics of other dealers with petitioner's performance, petitioner's percent of annual return on agricultural pre-tax income and percent of annual return on industrial pre-tax income were 120.43 percent and (49.88) percent, respectively, if invested capital is allocated between the two on the basis of sales. The record does not show whether such an allocation would be appropriate and further does not show the accuracy of the results of petitioner's operations analyzed separately for agricultural and industrial sales. For instance, for its fiscal year 1975 petitioner allocated $76,786 of Mr. Elliott's compensation to industrial sales, although *174 the record clearly indicates that there was no net profit from industrial sales prior to this allocation. Since Mr. Elliott's bonus was stated to be based on profits, we do not understand this allocation if the two segments of the business are to be separately considered. For these reasons we considered petitioner's overall pre-tax income for its fiscal year ending February 28, 1975, of $157,074 as compared to its total equity of $415,133, which results in an overall percentage of annual return on pre-tax income to equity of 38 percent to be more indicative of petitioner's operating results. This 38 percent does not compare favorably to the 50.51 percent of average return on equity capital of John Deere agricultural dealers in Zone 11 in the same sales volume classification as petitioner. Again, it is pointed out that the companies involved in the statistics compiled by John Deere engaged only in either agricultural or industrial sales, and the results reported therefore were the average total results of the reporting companies. While the average 38 percent does compare favorably with the 24.66 percent average of industrial dealers, we do not consider such a comparison to be *175 one to which an independent investor would look in determing results which would satisfy him. In 1975 the pre-tax return of all John Deere agricultural dealers was 48.77 percent and of industrial dealers, 5.20 percent, whereas for petitioner's fiscal year ending February 28, 1976, the pre-tax return on agricultural equipment, computed as above stated for fiscal year 1975, was 35.61 percent and on industrial equipment, 24.23 percent. Again we did the overall average, with a resultant 33 percent overall profit before taxes in this year. This overall profit does not compare favorably with the 1975 profit of John Deere agricultural dealers in the same sales volume classification and zone as petitioner but does compare favorably with the overall profit for industrial dealers. We stress this because the statistics, as we have heretofore pointed out, are with respect to dealers that dealt in only agricultural or only industrial equipment, whereas petitioner's determination of profit between the two types of equipment is based on various allocations and not on actual keeping of an accurate cost accounting system with respect to any items other than sales and the salaries or wages *176 paid to certain employees who dealt only in one area or the other. In petitioner's fiscal year 1976, its industrial sales were only about half of such sales of the preceding year. In our view, a fair comparison is petitioner's overall profit to equity compared to the profit to equity of other John Deere dealers selling agricultural equipment, with some small reduction to give minimal consideration to John Deere dealers which dealt only in sales of industrial equipment. Considered in this manner, the indication from the record is that in the 2 years here involved petitioner's profits as a percentage of equity were somewhat less than other John Deere Dealers. We also compared the average net profit before taxes of other John Deere dealers with sales comparable to petitioner's with petitioner's total net profit before taxes. With respect to agricultural dealers, in 1974 the average dealer comparable to petitioner earned $198,159 before taxes and the average industrial dealer earned $192,956 before taxes, as compared to petitioner's total net profit of $157,074. In 1975, the average agricultural dealer with sales comparable to petitioner's earned $258,592 and the average *177 industrial dealer earned $8,076, as compared to petitioner's $169,663 net profit. For the same reasons we have stated above, in our view an independent investor would compare petitioner's overall net profits primarily with the net profits of John Deere dealers with comparable sales which sold agricultural equipment. Although we have set forth the totals of the average net profits of agricultural and industrial dealers in our findings, since other dealers did not handle both products we do not consider it fair to compare this total to petitioner's net profits. However, from the facts we have found such a comparison is unfavorable to petitioner. Comparing petitioner's total net profits before taxes with the average total net profits of other comparable John Deere dealers which sold agricultural equipment only, it is clear that petitioner's total net profits do not compare favorably. In determining whether an independent investor would be satisfied with the net profit return of petitioner, it is our view that such an independent investor would use the statistics compiled by John Deere Company to determine the profitability of petitioner as compared to other John Deere dealers, *178 particularly in years in which economic conditions accounted for the large sales of agricultural equipment by all John Deere dealers. When an independent investor considered the fact that petitioner's operations were less profitable in the years here in issue than other John Deere dealers in agricultural equipment and the fact that petitioner's profits before taxes as a percentage of equity were less in these years and in some prior years than other John Deere dealers in agricultural equipment, we concluded that an independent investor would not have been satisfied to give a bonus to Mr. Elliott of 50 percent of the company's net profits before deduction for income taxes and management bonuses based on an unwritten contract without a time period or other limitations. Particularly is this true since a knowledgeable independent investor would know that a high percentage of petitioner's net profits in the years here in issue were due to favorable economic conditions affecting all John Deere dealers in agricultural equipment. In our view an independent investor would have made some modification to the bonus payment to Mr. Elliott because of these factors. There was no written *179 agreement between petitioner and Mr. Elliott as to his bonus, although the formula had been continued from year to year. In our view an independent investor in the years here in issue would have insisted on some modification to have a return retained by petitioner more in line with the return retained by other John Deere dealers in agricultural equipment. We are aware that an analysis of what an independent investor would have expected and required and be willing to approve is a question of judgment or opinion which is certainly subject to differences. It is a subjective analysis based on judgment which is not infallible. However, here we have attempted to follow the directions of the Circuit Court in remanding the case to us and consider the various factors in light of the instructions by the Circuit Court but we have applied our judgment to the facts. The final factor that we were directed to consider by the Circuit Court is Factor (E), "Internal Consistency." Here we were directed to consider the reasonableness of the formula under which Mr. Elliott received his bonus, particularly with a view to whether there was overcompensation in good years and undercompensation *180 in bad years. In our view this record does not support a conclusion that Mr. Elliott was undercompensated in prior years. As shown in our findings, the following schedule compares the compensation paid to Mr. Elliott in Petitioner's fiscal years ending February 28, 1968 through 1973 with the average total compensation paid to officers and owners/managers of other comparable John Deere dealers: Petitioner--
John Deere
Total Average
Fiscal Year
Compensation
Dealers--
Compensation Paid to
Ending
Paid to
Calendar
Officers, Owners
February 28
Mr. Elliott
Year
and Managers
1968
$42,800
1967
$20,889
1969
19,600
1968
32,134
1970
34,035
1969
27,090
1971
84,450
1970
47,797
1972
68,323
1971
48,524
1973
66,401
1972
43,749
1974
136,536
1973
75,127
In all but one of these prior years Mr. Elliott was more highly compensated than the average of all officers and owners/managers of other John Deere dealers located in petitioner's area with sales comparable to petitioner's. We have previously analyzed the comparison of the compensation paid by petitioner to Mr. Elliott with the compensation paid by other John Deer dealers *181 to officers and owners/managers for the years here in issue. As we previously stated, the clear indication is that the average paid by other John Deere dealers was the average of the total paid to all officers and owners/managers, which the record indicates in most instances would be more than one person. In our view, this evidence clearly indicates that Mr. Elliott was not undercompensated in prior years. There is no evidence in the record to indicate that petitioner undercompensated Mr. Elliott in prior years and the evidence that is in the record indicates that Mr. Elliott was not undercompensated in prior years. In our view, there is no evidence in this record to indicate that an independent investor would consider himself bound by a formula granting 50 percent of its profits to its chief executive officer in the phenomenally good years here involved. Particularly is this the situation where the evidence shows that economic conditions in the industry were to a large extent responsible for the increase in sales of all John Deere agricultural equipment. In our view an independent investor would not have concluded on the facts here present that Mr. Elliott was undercompensated *182 in prior years if such investor knew that the officers of other John Deere dealers had not been as well compensated in prior years and were not as well compensated in the current years as Mr. Elliott. The Circuit Court states that "Taxpayer persuasively argues that, accepting the Tax Court's determination of reasonable compensation for 1974 and 1975, Elliott was severely undercompensated in terms of constant dollars in six of the seven preceding years." 716 F.2d at 1248. It might be pointed out that the reverse of this argument would be that, applying a similar index to Mr. Elliott's compensation in prior years, the compensation we determined for Mr. Elliott in the years in issue was excessive. In fact, respondent made such an argument in support of the determination he made in his deficiency notice. As heretofore stated, in our view Mr. Elliott was adequately compensated for his work in prior years. However, we were and are unwilling to apply an index to his prior years compensation to arrive at reasonable compensation for the years here in issue, since on this record we conclude that the work done by Mr. Elliott for petitioner in the current years when *183 economic conditions caused sales and profits to increase so greatly deserves an increase in addition to a mere inflation index adjustment. In effect petitioner's argument is that Mr. Elliott's compensation should be the same every year except for inflation adjustments; but petitioner would start with the years in issue and go back, while respondent would start with prior years and go forward. In our view, neither of these computations is indicative of reasonable compensation. Reasonable compensation varies for reasons other than changes in the inflation index. The evidence in the record indicates that Mr. Elliott was reasonably compensated in all years prior to the years under consideration but that reasonable compensation for him in the years here in issue is greater than applying an index to compensation in prior years. In analyzing the reasonableness of the yearly bonus formula as applied to the years here involved, as instructed by the Circuit Court we have given no consideration to the fact that Mr. Elliott was the sole stockholder of petitioner but attempted to assess *184 the reasonableness of the payments to Mr. Elliott in these years of 50 percent of petitioner's profits, which resulted to a great degree from unusually good economic conditions, on the basis of the objective evidence in the record.In so doing we have considered, as the Circuit Court directed, the fact that petitioner paid bonuses to all of its other employees collectively of only $20,000 in its fiscal year 1975 and $25,000 in its fiscal year 1976. The bonuses paid to all other employees of petitioner were undoubtedly based on the evaluation of the work of these employees by petitioner's officer, managers and board of directors. However, the amounts paid to these employees for years as profitable to petitioner as the 2 years here involved were small indeed in comparison to the bonuses paid to Mr. Elliott. In summary, in our view the unwritten formula used to determine Mr. Elliott's bonus was unreasonable in the years here in issue when considered in light of the facts in this record and the factors we were directed by the Circuit Court to consider. The formula basically was that Mr. Elliott kept 50 percent of the net profits of the company before his bonus or other bonuses, *185 regardless of the reason for increased sales and increased earnings of the company. While an independent investor on a short-term basis to get a company started might be willing to agree to a bonus of 50 percent of profits, in our view an independent investor would not be willing on a long-term basis to agree to such a bonus without reference to the reason for changes in profitability of the company or the amount of the company's profits. Particularly would this be true when, because of such a bonus, the independent investor's company was achieving less net profits before taxes than other comparable companies and was paying much more in compensation to one officer than comparable companies were on the average paying to all their officers and owners/managers combined. We have attempted to analyze the facts of this case in light of the directions of the Court Court of Appeals, and based on our analysis conclude that $120,000 is reasonable compensation for Mr. Elliottin petitioner's fiscal year 1975, and $125,000 is reasonable compensation for Mr. Elliott in petitioner's fiscal year 1976. Decision will be entered in in accordance with the computation made by the *186 parties on the basis of our Memorandum Findings of Fact and Opinion filed July 30, 1980. Footnotes
1. Unless otherwise stated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years here in issue. ↩
2. The court stated that a formula which is reasonable at its inception may become unreasonable because of changed circumstances, but where a formula has proved reasonable over a long period of time, it should normally not be deemed unreasonable solely because it has overcompensated in 1 or i years.↩
3. Petitioner's brief contained the following schedule: Consumer
Compensation
Year Ended
Compensation
Price Index
Paid in
February 28
Paid
1967 = 100.0
1975 Dollars
1968
$ 42,800
The Consumer Price Index for the calendar year ending immediately prior to the end of the respective fiscal year is used because the fiscal year ends only 2 months after the close of the calendar year.
*↩ 100.0
$ 62,959
1969
19,600
104.2
28,008
1970
34,035
109.2
46,934
1971
84,450
116.3
110,461
1972
68,323
121.3
85,950
1973
66,401
125.3
80,876
1974
136,536
133.1
155,651
1975
181,074
147.1
181,074
1976
193,663
161.2
166,356
1977
153,696
170.5
117,731
1978
83,052
185.0
51,575
Total
$1,063,630
$1,087,575
Average
96,694
98,870
4. In this respect, petitioner's brief contained the following schedule: Year Ended
Pre-Tax - After salary to Mr. Elliott. [1]
After Tax - After salary to Mr. Elliott and after State and Federal income taxes. [2]
Returns - Based on after tax profits.
[4]
February 28
Profits
Profits
Equity - Invested capital plus retained earnings. [3]↩
(Percent)
1968
$25,090
$19,715
$130,387
15
1969
5,635
4,206
131,518
3
1970
27,042
19,190
149,442
13
1971
77,569
43,934
192,708
23
1972
59,873
36,713
226,629
16
1973
57,951
37,268
263,030
14
1974
112,536
63,674
326,441
20
1975
157,074
88,969
415,133
21
1976
169,662
98,297
513,429
19
1977
129,696
78,250
590,597
13
1978
59,052
42,860
633,496
7