GERRIT VANDERPOL AND HENRIETTA VANDERPOL AND VAN'S TRACTOR, INC., Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Vander Pol v. Commissioner
Docket No. 18729-84.
United States Tax Court
T.C. Memo 1987-555; 1987 Tax Ct. Memo LEXIS 547; 54 T.C.M. (CCH) 1021; T.C.M. (RIA) 87555; November 4, 1987; As amended November 25, 1987 John L. Burghardt, for the petitioners. Donna J. Rice, for the respondent. WRIGHT
MEMORANDUM FINDINGS OF FACT AND OPINION WRIGHT, Judge: By separate notices of deficiency dated March 15, 1984, respondent determined deficiencies in petitioners' Federal income tax as follows: Petitioner
Taxable Year
Deficiency
Van's Tractor, Inc.
1977
$ 25,401
1978
36,588
1979
33,471
Gerrit and Henrietta
VanderPol
1977
$  9,433
1978
11,814
1979
16,157
*548 After concessions, the sole issue for decision is whether the amounts paid by Van's Tractor, Inc., to its officer-shareholder Gerrit VanderPol, during the taxable years 1977, 1978 and 1979, constitute reasonable compensation within the meaning of section 162(a)(1). [1]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by reference. Petitioner Van's Tractor, Inc. (hereinafter referred to as the corporation), was organized under the laws of California. The corporation maintained its corporate headquarters and principal place of business in Modesto, California, at the time the petition was filed. During the taxable years in issue, the corporation, an accrual basis taxpayer, was engaged on the sales and service of farm equipment and machinery. On its corporate income tax returns for fiscal years 1977, 1978 and 1979, the corporation *549 claimed deductions in the amounts of $ 54,161, $ 76,225 and $ 72,762, respectively, for compensation paid to officers under section 162. Petitioners Gerrit and Henrietta VanderPol (hereinafter referred to as VanderPol or the VanderPols) resided in Modesto, California, at the time they filed their petition. The VanderPols, cash basis taxpayers, filed joint income tax returns for the calendar years 1977, 1978 and 1979. They claimed the benefit of the maximum tax on earned income under section 1348 for all amounts received as compensation from the corporation. All of the 700 shares of the corporation's outstanding stock are owned by the VanderPols. In 1965, the year the corporation was organized, the VanderPols made an initial contribution of capital in the amount of $ 35,000. Since then there have been no contributions to capital. The officers and directors at all times since incorporation have been Gerrit VanderPol as president and Henrietta VanderPol as secretary/treasurer. VanderPol was born and raised on a farm in Washington, where he became familiar with farming techniques and equipment. His first job was selling farm equipment for International Harvester. In 1947, *550 he opened a farm equipment dealership with his brother in Washington. Fourteen years later he sold his share to his brother and moved to Modesto, California, where he invested the proceeds in another farm equipment dealership. This business, a sole proprietorship which subsequently incorporated as Vann's Tractor, Inc., was engaged in selling used tractors. Van's Tractor, Inc., was successful almost immediately, chiefly because VanderPol purchased used tractors directly from Great Britain. Using this purchasing procedure, VanderPol took advantage of certain foreign tax provisions, and saved roughly 50 percent of the cost per tractor. He also provided a six-month 100 percent warranty on the used tractors, which was highly unusual. In 1971, the corporation bought a Massey-Ferguson dealership in Modesto, California, expanding the original product lines of Van's Tractor. VanderPol ceased importing used tractors when the tax advantages which lowered the cost of used tractors in Great Britain were eliminated. In 1975, the corporation purchased the assets of Valley Tractor, a John Deere dealership. Valley Tractor had two sales locations, one in Modesto, California, and one in Patterson, *551 California (hereinafter referred to as John Deere Modesto and John Deere Patterson). These two stores continued to do business under the name of Valley Tractor, although they were owned by the corporation, Van's Tractor, Inc. As evidenced by the figures below, the corporation was successful and enjoyed a consistent level of profitability. Net profit as
Fiscal
Gross
Book
Net
Beginning
a percentage
Year
Sales
Income
Profits
Net Worth
of Net Worth
1976
$  6,311,634
$ 178,615
$ 358,204
$ 543,240
65.94%
1977
6,211,578
108,642
190,483
721,855
26.39%
1978
7,420,896
105,034
266,832
828,634
32.20%
1979
10,755,917
191,242
243,637
944,777
25.79%
Although VanderPol was the general manager for all three locations, each operation was distinct and maintained separate books, employees, bank accounts and franchises. By 1979, the corporation held the following franchises: John Deere, Patterson: Agricultural Dealer Franchise, Consumer Products Dealer Franchise, Agricultural Dealer Security Agreement, Agricultural Dealer Leasing Agreement, Consumer Products Dealer Leasing *552 Agreement; John Deere, Modesto: Consumer Products Dealer Agreement, Agricultural Leasing Agreement; Massey-Ferguson: Dealers Sales and Service Agreement. Each of these franchises was obtained through VanderPol's skillful negotiations and each brought more business to the corporation. In 1979, VanderPol was awarded the John Deere engine distributorship, which authorizes him to sell John Deere equipment to other dealers. The distributorship was one of three in California and was awarded after a lengthy and competitive selection process. At all three locations the corporation's principal business was the sale and service of the franchise line equipment. However, all three locations also sold more complementary lines of equipment than other dealerships in the area. The corporation continually expanded the number of product lines throughout the years in issue. Due to the generally favorable weather conditions and the long growing season, the region was able to sustain numerous different kinds of agricultural operations, which, in turn, required a wide range of farming equipment. [2] Many of the crops required round-the-clock care, placing heavy demands on agricultural equipment. *553 To meet these demands the corporation provided service and maintenance 24-hours a day. The continuous nature of the servicing needs meant that the corporation had to keep a large inventory of parts in stock. VanderPol initiated a sophisticated ordering system. Unlike other farm equipment dealership owners who estimated future needs by looking exclusively to past sales records, VanderPol conducted thorough research into a number of different factors which would have impact on the upcoming market. He read farm magazines and government reports to aid him in ordering new equipment and parts. He also watched fluctuations in market conditions for chief crops to assist him in determining what his future ordering needs would be. The parties agree that Vanderpol worked very hard. He worked an average of 12 to 16 hours per day, frequently staying late to do office work. He tried to visit every sales location each day but was not always able to do so. VanderPol was ultimately responsible for every facet of his business. As a general manager he supervised all aspects of the business *554 at all three locations. [3]
VanderPol was responsible for ordering, purchasing and managing inventory. If specific equipment was necessary he would often travel to obtain it. Occasionally VanderPol would make mechanical alterations to available equipment to create a product better suited for a particular agricultural need. He approved sales, [4] discounts and larger trades of equipment. He supervised personnel and monitored the parts and service departments as well as the sales staff at each of the three locations. He implemented an advertising program. He organized community farm activities, such as an annual tractor pull exhibition. He also participated in both the Future Farmers of America and the 4-H Program. VanderPol placed great emphasis on customer service. VanderPol would occasionally make trips out into the farming community to listen to the farmers' needs and concerns, as well as to *555 cultivate goodwill. Pursuant to his purchasing contract for the John Deere franchise, VanderPol was required to erect a new plant. He contributed to the building plan and designed an innovative service bay which made it easier for the employees to repair the equipment. VanderPol established individual credit policies for his businesses. These have helped to protect the corporation from financial distress at a time when other farm equipment dealers were experiencing an unusually high loan failure rate. Indeed, in its 35 years of doing business, the corporation has repossessed equipment, as a result of default, only 6 times. VanderPol has never taken a vacation, although he has traveled extensively on business, investigating new sources of supply and product lines from around the world. These trips were exclusively business-related. He has never been accompanied by his wife on any of his business trips. Pursuant to the *556 banks' financing requirements, VanderPol had to personally guarantee each loan the banks made to the corporation. Similarly, VanderPol personally guaranteed all the leases held by the corporation. VanderPol was also the sole owner of two other businesses. He owned Vanco Leasing Company, an in-house leasing business, which handled mostly farm equipment and related items. VanderPol estimated that he spent about 2 hours a week on Vanco business. He also owned Gervans, a wholesale company which distributed sprayers and other equipment to distributors. This business only required 4 to 6 hours of VanderPol's time per week. Each of these businesses had its own employees and VanderPol's involvement was exclusively managerial. Neither of these businesses had their own separate physical plants. Vanco was located in the Massey-Ferguson dealership in Modesto, while Gervans was situated at John Deere, Modesto. VanderPol was paid under a combination salary and bonus scheme. As a salary he received $ 60,000 from the Massey-Ferguson dealership in Modesto. He received combined salary from the two John Deere dealerships in the amount of $ 72,000 in 1977 and $ 92,059 in 1978 and $ 104,110 *557 in 1979. The John Deere dealerships also paid him a bonus. VanderPol received the following amounts of compensation during the years in issue: Massey-Ferguson
John Deere
Year
Salary
Salary
Bonus
Total
1977
$ 60,000 $  72,000
$  59,669
$ 191,669
1978
60,000
92,059
90,000
242,059
1979
60,000
104,110
106,640
270,750
The bonus was computed under a formula which had been in effect since before 1976. The formula allocated to VanderPol 20 percent of the net profit as shown on the books of the two John Deere locations together. The figure used to determine the bonus amount equalled taxable income before certain adjustments were made by the return preparer. [5] The bonus payments were each authorized by the Board of Directors in the corporate minutes. *558 The corporation had a profit sharing plan for the employees, and a bonus payment scheme related to sales and service. The Massey-Ferguson employees received cash bonuses while contributions were made to the profit sharing plan for the John Deere employees. VanderPol never participated in the plan, although he was entitled to do so. VanderPol chose a profit sharing plan because it was flexible and sensitive to the needs of the business. Contributions were made at a maximum level of 15 percent of the employee's salary. [6] The contribution to the profit sharing plan was computed after the bonus payable to the officer-shareholder was subtracted. The total compensation scheme for the corporation's employees was: Officer's
Percent
All
Percent
Year
Total Sales
Salary
of Sales
Employees
of Sales [7]
(including
bonus)
1976
6,311,634.00
221,453.00
3.51%
842,651.00
8.3%
1977
6,211,578.00
191,669.00
3.09%
836,938.00
13.47%
1978
7,420,896.00
242,059.00
3.26%
959,259.00
12.93%
1979
10,755,917.00
270,750.00
2.52%
934,490.00
8.69%
*559 The corporation has never paid dividends. Retained earnings were reinvested in the business. Because the equipment that the corporation sold was generally very expensive, the seller frequently provided substantial financing. The bulk of retained earnings went to carrying charges on the accounts receivable. Retained earnings were *560 also used to purchase spare parts and equipment. VanderPol believed it was necessary to keep a large inventory of parts on hand at all times. Furthermore, Vanderpol was advised by his accountant, Darrell Kaiser (hereinafter referred to as Kaiser) not to pay dividends. This advice was based on two premises. Kaiser's first concern was that the payment of dividends might prevent the corporation from repaying the large amount of debt it was carrying and perhaps from acquiring new debt. The second consideration was the loan agreement between the corporation and its chief lender, Lloyd's Bank. The terms of that agreement prevented the corporation from paying dividends or raising salaries without permission of the lender. Although the corporation never declared dividends, it did increase salaries annually without authorization from the bank. OPINION The principal issue for decision is whether the amounts paid in 1977, 1978 and 1978 to VanderPol by the corporation are deductible under section 162(a) as reasonable compensation for services rendered. If we hold that the section 162(a) deductions were proper then it necessarily follows that the individual petitioners may treat such *561 amounts as personal service income within the meaning of section 1348. [8]
Section 162(a)(1) provides a deduction for all ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business. This includes a "reasonable allowance for services actually rendered." Section 1.162-7(a), Income Tax Regs., requires that the compensation be reasonable in amount and that the payment be for actual services rendered. [9] The regulations further explain that a reasonable amount is one which would result from an arm's-length bargain between employer *562 and employee. Finally, reasonable compensation is limited to the amount that would ordinarily be paid by an enterprise under like circumstances. Sec. 1.162-7(b), Income Tax Regs.
In the instant case, respondent maintains that the compensation paid *563 by the corporation to its officer-shareholder in the years 1977, 1978, and 1979 was excessive and unreasonable. In the alternative, respondent contends that even if the compensation was reasonable in amount, the payments constituted disguised distributions of earnings and profits with respect to stock. Petitioner takes the position that the payments made by the corporation to the officer-shareholder in the years in issue comprised reasonable compensation for services actually performed and not disguised dividends. Respondent's determination is presumptively correct, and petitioners have the burden of proving otherwise, Botany Worsted Mills v. United States,278 U.S. 282 (1929); Rule 142(a), Tax Court Rules of Practice and Procedure.The burden is on petitioner to show that it is entitled to deductions from compensation paid to officers in excess of the amounts allowed by respondent. Laure v. Commissioner70 T.C. 1087 (1978), affd. in part, revd. in part 653 F.2d 253 (6th Cir. 1981). If petitioners successfully prove error, the Court must *564 then determine what was reasonable compensation under the particular facts and circumstances. Pepsi-Cola Bottling Co. of Salina, Inc. v. Commissioner,61 T.C. 564, 568 (1974), affd. 528 F.2d 176 (10th Cir. 1975). The issue of reasonable compensation is a factual question and must be decided on the basis of all the facts in each particular case. Home Interiors & Gifts, Inc. v. Commissioner,73 T.C. 1142 (1980); Pepsi-Cola Bottling Co. of Salina, Inc. v. Commissioner, supra;Botany Worsted Mills v. United States, supra;Rule 142(a). Where controlling officer-shareholders set the levels of compensation that they will receive as employees, as in the case before us, we must use close scrutiny to determine whether the purported compensation is a disguised dividend. Trinity Quarries, Inc. v. United States,679 F.2d 205 (11th Cir. 1982); Nor-Cal Adjusters v. Commissioner,503 F.2d 359 (9th Cir. 1974), affg. a Memorandum Opinion of this Court; Levinson & Klein, Inc. v. Commissioner,67 T.C. 694 (1977). *565 Many factors are relevant in determining whether compensation is reasonable and no single factor is dispositive. [10] As this case is appealable to the Ninth Circuit we are required to follow that court's applicable law. Golsen v. Commissioner,54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1971). In Elliotts, Inc. v. Commissioner,716 F.2d 1241 (9th Cir. 1983), revg. and remanding a Memorandum Opinion of this Court, the court of appeals articulated an analytical structure for this inquiry. Specifically, the Ninth Circuit used a facts and circumstances test comprised of five broad categories. Therefore, for purposes of our analysis here, we shall use similar criteria and organizational framework. Role in Company
The *566 first category among the Elliotts, Inc. factors is the role of the employee in the company, particularly whether the employee was instrumental to the corporation's success in part or in whole. Based on the record before us, it is apparent that VanderPol was indispensable to the corporation and was singlehandedly responsible for the success the corporation enjoyed. [11] VanderPol managed and supervised the sales and service staffs for three different locations, relying on knowledge of a wide range of equipment, parts and service. He also explored new markets and new products through tireless research and investigation, which other dealers in the area did not do. VanderPol made all the management decisions from strictly routine choices to broad policy goals. He worked an average of 12 to 16 hours a day, without a vacation. External Comparisons
The second consideration requires us to compare the financial well being of the corporation with the industry as a whole. This includes a comparison of the employee's compensation to those paid by similar companies for similar services. While evidence *567 introduced to show industry comparables is relevant, the failure to show an exact industry comparable is not in itself dispositive. Home Interiors & Gift, Inc. v. Commissioner, supra.
Neither petitioner nor respondent introduced expert testimony at trial. [12] One of petitioner's witnesses was Jerry Schuller (hereinafter referred to as Schuller), a rival John Deere dealer. Schuller testified that for his two John Deere dealerships, one with gross sales of 2.8 million dollars and the other with gross sales of 1.5 million dollars, he paid the general managers an average of $ 85,000 each per year in compensation. [13]
*568 Respondent introduced Marvin Davis (hereinafter referred to as Davis), a competitor, with three farm equipment dealerships in the neighboring area. [14] The gross sales from the three dealerships Davis owned rivalled the sales of the corporation in the instant case equalling approximately $ 8,000,000 in 1977, $ 10,000,000 in 1978 and $ 11,000,000 to $ 12,000,000 in 1979. During 1979, Davis and his partner each received compensation totalling approximately $ 80,000 to $ 100,000. Both Schuller and Davis testified that the compensation paid by the corporation to VanderPol was reasonable. This opinion was echoed by Barry Bunte (hereinafter referred to as Bunte), the executive vice president of the Far West National Farm and Power Equipment Dealers Association, [15] who testified for respondent. *569 Respondent called Thomas Samuelson (hereinafter referred to as Samuelson) a vice president of Lloyd's Bank. Lloyd's Bank has made several sizable loans to the corporation. Samuelson is experienced at evaluating the financial viability of farm equipment dealerships. After considering the sales, debt and net worth of the corporation Samuelson stated that the compensation paid by the corporation to VanderPol was reasonable. Indeed, the only witness who stated with any conviction that the compensation was unreasonable was respondent's auditing agent. [16] In light of the conformity of opinion held by persons who, although not experts, have experience in the industry, we find this evidence to be credible. Character and Condition of Company
This third factor includes an examination of the company's size as indicated by its sales, net income or capital income, the complexities of the business and the prevailing economic conditions. [17]Elliotts, Inc. v. Commissioner, supra.
*570 The corporation was apparently a leader in the farm equipment sales industry and operated at a high level of efficiency and profitability. The corporation's sales area encompassed up to five times the market area and contained up to three times the sales potential as its competitors. Indeed, respondent's own witness, Bunte, found that the corporation's sales were so large as to make them beyond comparison with other farm equipment dealerships in the California area. The corporation's success was due in part to the franchise rights which VanderPol obtained under favorable terms after long and arduous negotiations. VanderPol's unique management style contributed to the corporation's success. Unlike other dealers, VanderPol travelled the world looking for new farm equipment or procedures which could be marketed in the corporation's sales area. This was particularly complicated because the corporation's sales area produced so many different kinds of crops. The corporation's sales frequently required financing. VanderPol devised credit policies for in-house financing and made recourse arrangements for outside financing. The corporation experienced only six defaults on payment, *571 leading to repossession, during all its years in business. Due to VanderPol's insightful business acumen and use of innovative marketing techniques the corporation became a leader among California farm equipment dealerships.
Conflict of interest
The fourth factor under the Elliotts, Inc. analysis is whether there was a conflict of interest between the company and the employee. To determine this the Ninth Circuit looks for the existence of an arm's-length bargain or, if there is none, at whether a hypothetical independent investor would consider the compensation reasonable. Under the first prong of the inquiry it is unlikely that VanderPol could establish that there was arm's-length bargain with the corporation. It is futile for a controlling shareholder to attempt to characterize his relationship with the corporation as disinterested. Even an arrangement which appears fair and equal would be suspect if it arose between an employee and the corporation he controls. [18]
*572 Another investigative criterion under the arm's-length bargain inquiry is a corporation's dividend history. Pacific Grains, Inc. v. Commissioner,399 F.2d 603 (9th Cir. 1968), affg. a Memorandum Opinion of this Court. The corporation in the instant case has never paid dividends. Rather, earnings and profits were reinvested into the corporation to accomplish two business objectives. First, the corporation maintained an unusually high level of inventory at all three locations to insure speedy service. Secondly, the funds supported the extensive credit that the corporation routinely offered on the sale of large farm equipment. Furthermore, the financing agreement that the corporation had with its creditor, Lloyd's Bank, precluded the declaration and distribution of dividends without permission. Kaiser, petitioner's accountant and advisor, had warned him that he might endanger his relationship with this important creditor if dividends were paid. [19] We note, however, that the mere absence of dividend distributions does not require a conclusion that the amount of compensation is unreasonably high or contains hidden dividend distributions. Elliotts, Inc. v. Commissioner, supra at 1247. *573 Because it is impossible for VanderPol to demonstrate that his salary was the result of an arm's-length bargain, our inquiry turns to the second prong of the analysis, the question of the hypothetical independent investor. The Ninth Circuit explained this in the following way: If the bulk of the corporation's earnings are being paid out in the form of compensation, so that the corporate profits, after payment of the compensation, did not represent a reasonable return on the shareholder's equity in the corporation, then an independent shareholder would probably not approve of the compensation arrangement. If, however, that is not the case and the company's earnings on equity remain at a level that would satisfy an independent investor, there is a strong indication that management is providing compensable services and that profits are not being siphoned out of the company disguised as salary. [Footnote references omitted.]
Elliotts, Inc. v. Commissioner, supra at 1247. Where the net worth of the corporation *574 has increased, a hypothetical investor would not begrudge the salaries necessary to achieve it. With an initial capital outlay of $ 35,000 the corporation's gross sales equalled $ 451,989 in 1966. By 1979 gross sales had grown to $ 10,755,917, an increase of 237.96 percent. These are factors which would indicate to an investor that the corporation was accruing in value. An important criterion for estimating the financial well-being of a corporation from the perspective of an independent hypothetical investor is the rate of return on equity. The Ninth Circuit in Elliotts, Inc. defined this as the relationship between net profits and equity. 716 F.2d at 1247. In Elliotts, Inc. the Ninth Circuit determined that 20 percent would be an acceptable rate of return for an independent hypothetical investor. However, on remand, we determined that rates for return on equity from other corporations similarly situated required us to set the level of return on equity at a higher figure. For John Deere dealerships with sales between $ 3 and $ 4 million the rate of return averaged 50.51 percent (48 T.C.M. 1245, 1250, 53 P-H Memo T.C. par. 84,516 at 2092) *575 and for similarly situated dealerships this would be the figure expected by a hypothetical independent investor. On brief, both petitioner and respondent submitted figures for return on equity. [20] With the evidence submitted to us at the trial and the information presented to us on brief, it is impossible to determine what the actual rate of return on equity was for the corporation during the years in issue. Moreover, in the instant case, there is evidence that there are no similarly situated John Deere dealerships from which the corporation's gross sales to those in Elliotts, Inc., because the corporation's gross sales are far greater. Thus, we find that a rate of return on equity of 50.51 percent cannot be applied to the facts before us. Internal Consistency
The fifth and final factor under the Elliotts, Inc. analysis considers whether the payments schedule *576 is related exclusively to the performance of services to the corporation. Bonuses, while not inherently suspect, are strenuously scrutinized. Mayson Mfg. Co. v. Commissioner, supra.Bonuses which are consistently designated in amounts which reflect the percentage of the recipient's stock holdings, however, are suspect. Elliott's Inc. v. Commissioner, supra at 1247. The bonus schedule ought to be predetermined and authorized by the Board of Directors. The bonus should not be computed and awarded after a perusal of the year's profits. Nor-Cal Adjustors [Text Deleted by Court Emendation] v. Commissioner, supra.
In the instant case the bonus was consistently awarded under a predetermined formula. The record shows that 20 percent of the net profits, as shown on the internal corporate books from the two John Deere locations, was authorized as a bonus every year. The formula had been applied in the same way since before 1976. The evidence presented makes it abundantly clear that the bonus formula was consistently and unerringly applied during the years *577 in issue. Finally, it is appropriate to pay one employee more than others when he performs several jobs. Elliotts, Inc. v. Commissioner, supra at 1246. See Hammond Lead Products, Inc. v. Commissioner,425 F.2d 31 (7th Cir. 1970), affg. a Memorandum Opinion of this Court. In this case petitioner was the chief executive officer for three dealerships at different locations.
Conclusion
Accordingly, after a very careful analysis of all the facts and circumstances and thoughtful weighing of those circumstances, together with due consideration of the weight to be accorded to the oral testimony, we hold that the payments made to VanderPol as salary and bonus constituted reasonable compensation within the meaning of section 162(a). Therefore, the amounts are deductible to the corporation under section 162 as payments made for compensation and correspondingly, the individual petitioners are entitled to treat such compensation as personal service income within the meaning of section 1348. To reflect the concessions by petitioners, as well as the foregoing, Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Service Code of 1954, as amended and in effect during the years in issue, and all Rule references, unless otherwise noted, are to the Tax Court Rules of Practice and Procedure. ↩
2. The area produced from 19 to 26 different crops, many requiring specialized farm equipment. ↩
3. During the years in issue the corporation had about 55 employees. The two John Deere stores shared a sales manager, Irving Gilgert, while the Massey-Ferguson store had its own sales manager, Vern VanderPol, VanderPol's son. The three stores also shared a common bookkeeper. ↩
4. Because the salesmen were paid by commission their predictions of a customer's financial resources were occasionally unduly optimistic and credit would be extended too generously. VanderPol felt it necessary to check every large credit transaction. ↩
5. The following chart shows how the bonuses were computed: ↩
1977
1978
1979
Taxable Income - (From corporate
$ 158,305
$ 266,105
$ 214,329
income tax returns)
Add Back
LIFO Inventory Adjustment
-
40,697
111,831
Bonus to employees
27,332
24,800
56,200
Bonus to VanderPol
59,668
90,000
106,640
Profit Sharing
36,000
27,794
25,000
Massey-Ferguson Dealership
elimination
17,035
25,404
19,200
Base for Calculation
298,340
450,000
533,000
Percentage
20%
20%
20%
Bonus
59,668
90,000
106,640
6. Bonuses were paid to the Massey-Ferguson employees in the amounts of $ 27,332 in 1977, $ 24,800 in 1978 and $ 56,200 in 1979. Contributions to the John Deere employees' profit sharing plan were made in the amounts of $ 36,000 in 1977, $ 27,794 in 1978 and $ 25,000 in 1979. ↩
7. As requested by the parties, we have taken judicial notice of the facts relied upon in Elliotts, Inc. v. Commissioner,T.C. Memo. 1980-282, revd. and remanded 716 F.2d 1241 (9th Cir. 1983). Those facts include a chart showing total compensation in the amounts below. However, the data from the Elliotts case is not controlling here because that corporation had sales less than half of those in the instant case. This evidence, then, is relevant but not particularly compelling. See discussion, infra, at pages 22-23. ↩
Fiscal
Compensation
Percent
Total Employee
Percent of
Year
Sales
Paid to Officer
of Sales
Compensation
Sales
1976
3,467,758
150,001
4.33%
280,269
8.08%
1977
3,558,513
119,149
3.35%
262,849
7.39%
1978
3,052,209
58,518
1.92%
185,661
6.08%
8. Personal service income as used in section 1348(b)(1) means "wages, salaries, or professional fees, and other amounts received as compensation for personal services actually rendered, but does not include that part of the compensation derived by the taxpayer for personal services rendered by him to a corporation which represents a distribution of earnings or profits" as defined in section 911(b)↩. 9. Historically, courts tend to focus only on the reasonableness of the compensation. See, e.g., Pacific Grains, Inc. v. Commissioner,399 F.2d 603 (9th Cir. 1968), affg. a Memorandum Opinion of this Court, unless the Commissioner presents evidence that the payments were disguised dividends. Klamath Medical Service Bureau v. Commissioner,29 T.C. 339, 348-349 (1957), affd. 261 F.2d 842 (9th Cir. 1958). See Elliotts, Inc. v. Commissioner,716 F.2d 1241 (9th Cir. 1983), revg. and remanding a Memorandum Opinion of this Court. The Ninth Circuit will not presume an element of a disguised dividend from the bare fact that a profitable corporation does not pay dividends. See also Golsen v. Commissioner,54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940↩ (1971). 10. For a comprehensive list of the factors frequently used to determine reasonable compensation, see Pepsi-Cola Bottling Co. of Salina, Inc. v. Commissioner,61 T.C. 564, 567-568 (1974), affd. 528 F.2d 176 (10th Cir. 1975), quoting Mayson Mfg. Co. v. Commissioner,178 F.2d 115↩ (6th Cir. 1949).
11. VanderPol's importance to the corporation was conceded by respondent.↩
12. Pursuant to stipulation, the parties introduced three surveys into evidence. These were the Dealer Comparative Management Reviews for 1977, 1978 and 1979, and were prepared using data from certain John Deere dealers. However, the information contained in these reports is not helpful to us in evaluating the worth of the corporation in the instant case. The dealerships in the survey were apparently smaller and less profitable because the gross sales figure indicating high performance in the survey was one-fourth to three-fourths of the gross sales figure of the corporation before us. Thus, those dealerships are not comparable to Van's Tractor, Inc. ↩
13. In 1977, Schuller paid salaries in the amount of $ 79,000, in 1978 he paid salaries in the amount of $ 85,100, and in 1979 he paid salaries in the amount of $ 89,125 each. ↩
14. Marvin Davis built a successful Massey-Ferguson dealership 8-1/2 miles down the road from Van's Tractor. ↩
15. Pursuant to stipulation, the parties introduced the 1977, 1978 and 1979 Cost of Doing Business Studies prepared by the National Farm & Power Equipment Dealers Association. The information is not applicable to the instant case, however, because the sales volume and business complexity of the corporation are considerably greater than the sales volume and business complexity of the dealerships in the studies. ↩
16. A rival John Deere dealership with much lower sales figures said only that VanderPol's salary seemed "a little high."↩
17. During the years in issue the general market conditions were apparently fair although they have subsequently worsened appreciably. ↩
18. The factor of control cuts both ways. A controlling shareholder is in a good position to award himself an unreasonably large salary. Conversely, the fact that the employee is also the owner might cause him to forego reasonable compensation during lean years, putting the needs and welfare of the business first. See Allison Corp. v. Commissioner,T.C. Memo. 1977-166; Skyland Oldsmobile, Inc. v. Commissioner,T.C. Memo. 1972-17↩. 19. The same financing agreement also precluded an increase in salaries without prior approval but this restriction was not observed by the corporation. ↩
20. According to petitioner, the corporation's return on equity was 58.94 percent in 1977; 56.57 percent in 1978 and 53.95 percent in 1979. Respondent put forward alternative figures representing return on equity in the amounts of 19.1 percent in 1977; 28.2 percent in 1978 and 18.9 percent in 1979.↩